UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

NBCUNIVERSAL MEDIA, LLC et al.,

      Plaintiffs,

v.

JAY KENNETTE MEDIA GROUP LLC et al.,

      Defendants.

Case No. 2:22-cv-04541-SB-JPR

ORDER DENYING MOTION TO DISMISS [DKT. NO. 34]

Plaintiffs produced the popular television shows *The Office* and *Friday Night Lights* and claim to own trademarks in the terms DUNDER MIFFLIN and several marks related to DILLON FOOTBALL, which are used extensively in the shows.  Defendants, whom Plaintiffs characterize as trademark squatters, registered these marks and sell products that closely imitate the marks as they appear in Plaintiffs' shows.  Plaintiffs allege federal and state claims related to trademark infringement and seek cancellation of Defendants' marks.  Defendants move to dismiss Plaintiffs' First Amended Complaint (FAC) for lack of personal jurisdiction and failure to state a claim.  Dkt. No. 34.[1]  At a hearing on December

---

[1] Neither party has been careful with its filings in this case.  Defendants' original motion was filed at Dkt. No. 31, together with a request for judicial notice (RJN) at Dkt. No. 32.  Defendants later filed a notice of errata, Dkt. No. 33, and corrected versions of their motion, Dkt. No. 34, and RJN, Dkt. No. 35.  The Court accepts the latter filings as operative and denies as moot the earlier filings at Dkt. Nos. 31 and 32.  Plaintiffs also corrected their original opposition brief at Dkt. No. 40 by filing a notice of errata, Dkt. No. 43, and a corrected opposition, Dkt. No. 44.  The Court will consider the corrected brief.  Finally, Defendants erroneously filed two identical copies of their reply in support of their motion to dismiss, Dkt. Nos. 45, 46, and failed to file a reply in support of their RJN, despite referencing such a

9, 2022, the Court allowed the parties to engage in limited jurisdictional discovery and to submit supplemental briefs, which they did.  Dkt. Nos. 49, 58, 59.  The Court held a second hearing on the motion on January 27, 2023.  Because Defendants have not shown that the case should be dismissed under any of the theories they assert, their motion is denied.

## I.

Plaintiff NBCUniversal Media, LLC (NBCU) is a media company that has produced television shows including the U.S. version of *The Office*, which aired from 2005 to 2013, and *Friday Night Lights*, which aired from 2006 to 2011.  Dkt. No. 23 ¶¶ 13, 24, 48 (FAC).  *The Office* portrays employees at the fictional Dunder Mifflin Paper Company, which is prominently depicted in all 201 episodes of the show.  *Id*. ¶ 26.  Although NBCU's *The Office* was adapted from a U.K. television show with the same name, the Dunder Mifflin company was a creation of NBCU that did not appear in the U.K. version.  *Id*.  *Friday Night Lights* follows two high school football teams in the fictional town of Dillon, Texas.  *Id*. ¶ 45.  The show is inspired by a 1990 book and a 2004 movie about a real high school football team in Odessa, Texas.  *Id*.  Both shows were popular and critically acclaimed, garnering numerous awards and averaging millions of viewers per episode, and they retain popularity among viewers who continue to stream and discuss the shows.  *Id*. ¶¶ 24–25, 35–36, 48–49, 58–59.

Plaintiffs Universal Television LLC and Universal Licensing LLC are wholly owned subsidiaries of NBCU.  *Id*. ¶¶ 14–15.  Universal Television owns the common law trademark rights developed and created in *The Office* and *Friday Night Lights*.  *Id*. ¶¶ 14, 16.  Universal Licensing licenses Plaintiffs' intellectual property rights—including in *The Office* and *Friday Night Lights*—for use in merchandising, video games, and other products.  *Id*. ¶ 15.

In response to high public demand, Plaintiffs have created consumer products related to their series and licensed other entities to do the same.  *Id*. ¶ 30.  By November 2006, Plaintiffs were selling coffee mugs, hats, and other apparel featuring the DUNDER MIFFLIN mark, and they have continued to use the mark in an expanding variety of products and promotional materials over the years.  *Id*. ¶¶ 30–34, 37–41.  Universal Television created and owns stylized versions of various marks featured in *Friday Night Lights*, including DILLON PANTHERS,

---

reply elsewhere.  The parties should exercise greater care in the future to avoid complicating the record and the Court's review.

PANTHERS FOOTBALL, DILLON PANTHERS FOOTBALL, and EAST DILLON FOOTBALL (collectively, the FNL Marks). *Id*. ¶¶ 50–54. By February 2011, Plaintiffs were selling apparel and magnets featuring the FNL Marks, and they and their licensees have subsequently sold clothing, hats, mugs, magnets, blankets, ornaments, and water bottles bearing the marks. *Id*. ¶¶ 56–57. Plaintiffs sell their products featuring DUNDER MIFFLIN and the FNL Marks on NBCU's website and through third-party websites like Amazon and eBay. *Id*. ¶¶ 33, 57.

Defendant Kenneth Talbert, who lives in Tennessee, is alleged to be the owner, president, and chief executive officer of the other Defendants, Jay Kennette Media Group LLC (JKMG) and Gooder Labs, LLC (Gooder). *Id*. ¶¶ 19–20. Gooder is based in Tennessee, while JKMG has its principal place of business in Delaware. *Id*. ¶¶ 17–19. Plaintiffs allege that Defendants "have built a business based on registering trademarks belonging to others in order either to sell them back to their rightful owners or to profit from consumer confusion by selling branded merchandise that consumers inevitably will associate with a popular entertainment property . . . ." *Id*. ¶ 61. Defendants have registered or attempted to register more than 20 marks derived from media produced by others, including television shows such as *The Cosby Show* and *One Tree Hill* and movies such as *Dodgeball*, *Alien*, and *Blade Runner*. *Id*. ¶¶ 61–63. Several of these applications were filed on the same days in 2016, from which Plaintiffs infer "a clear strategy to squat on trademarks associated with multiple different popular entertainment properties." *Id*. ¶ 64.

In June 2016, Gooder filed an application with the U.S. Patent and Trademark Office (PTO) to register DUNDER MIFFLIN in Class 25 for use in connection with certain apparel. *Id*. ¶ 68. The application, which was signed by Talbert, claimed a first use in commerce date of January 9, 2007 (more than a year after Plaintiffs began selling DUNDER MIFFLIN-branded apparel). *Id*. After the PTO initially rejected the application because Defendants had submitted a digitally altered image, Gooder submitted a new image that precisely copied Plaintiffs' mark. *Id*. ¶¶ 70–73. The images below depict Plaintiffs' mark (on the left) and the product photograph submitted by Gooder (on the right):

 

*Id.* ¶¶ 27, 72.[2]  In January 2017, Gooder assigned its trademark registrations and pending applications to JKMG.  *Id.* ¶ 74.  The assignment agreement was signed by Talbert for both parties, and the consideration was $0.  *Id.*  The PTO ultimately granted Defendants' first DUNDER MIFFLIN registration application in July 2017.  *Id.* ¶ 73.  When Plaintiff Universal Television later sought to register DUNDER MIFFLIN as a character mark for entertainment services, the PTO rejected the application based on the likelihood of confusion with JKMG's registered mark.  *Id.* ¶ 91.

JKMG also applied to register DILLON FOOTBALL for use on apparel in November 2016.  *Id.* ¶ 81.  The application claimed a first use in commerce date of January 27, 2012, almost a year after NBCU began selling merchandise bearing the FNL Marks.  *Id.* ¶¶ 81–82.  The PTO granted registration in June 2017.  *Id.* ¶ 84.  In October 2021, JKMG filed additional applications to register DUNDER MIFFLIN as a mark in Classes 16 and 21, which cover certain office products, cups, mugs, and dishes.  *Id.* ¶ 75.  Those applications are currently pending.  *Id.*  Like the earlier submissions, the photographs JKMG submitted with its new applications also depict the DUNDER MIFFLIN mark in the same manner as it is depicted in *The Office*.  *Id.* ¶¶ 76–77.

Since 2015, Defendants have sold unauthorized merchandise, including shirts, hats, and mugs, bearing the DUNDER MIFFLIN and FNL Marks.  *Id.* ¶¶ 79, 86.  Plaintiffs include in their FAC photographs of DUNDER MIFFLIN-branded merchandise sold by Defendants that appears to exactly copy merchandise sold by Plaintiffs.  *Id.* ¶ 79.  Defendants' products bearing the DILLON FOOTBALL mark also resemble closely—but not exactly—Plaintiffs' products bearing the EAST DILLON FOOTBALL mark, as shown in the example below:

_____

[2] In his January 9, 2023 deposition, Talbert claimed that he thought "Dunder Mifflin" was just two surnames put together and that he was unaware before 2019 that it was the name of a fictional company on a television show.  Dkt. No. 59-2 at 98:21–993, 101:8–102:4.  Defense counsel refused to allow Talbert to answer questions about the similarity of the logos or why Talbert added "INC, PAPER COMPANY" to what he purportedly believed were two random surnames.  *E.g.*, *id.* at 107:8–110:23.




Plaintiffs' Use                    Defendants' Use

*Id*. ¶ 86.

Plaintiffs allege that Defendants have offered and sold merchandise using the DUNDER MIFFLIN and FNL Marks on Amazon.com and on Defendants' websites www.gooderdeals.com, www.goodergifts.com, and www.gooderlabs.com, and have also sold DUNDER MIFFLIN-branded merchandise on Walmart.com. *Id*. ¶¶ 78, 85. Plaintiffs allege that "[t]hrough these websites, Defendants sold merchandise to California," and that on information and belief, Defendants specifically targeted consumers in California. *Id*. The limited jurisdictional discovery allowed in this case shows that since October 2020, Defendants filled at least 13 orders for DUNDER MIFFLIN-branded clothing placed by California purchasers and shipped the products from Tennessee to California. Dkt. No. 59-5 at 7 of 26.

In 2019, Defendants sent takedown demands through eBay and Amazon to NBCU's licensees, claiming that the licensees were infringing Defendants' trademark rights by selling merchandise bearing the DUNDER MIFFLIN mark. Dkt. No. 23 ¶ 89. eBay is headquartered in California, and three of the retailers targeted by Plaintiffs are located in California. *Id*.; Dkt. No. 59-1 ¶ 3. Plaintiffs characterize the takedown notices as an attempt by Defendants to interfere with Plaintiffs' contractual relationships in California. Dkt. No. 23 ¶ 89.

In December 2021, NBCU sent a cease-and-desist letter to JKMG. *Id*. ¶ 90. JKMG refused to stop selling its products and responded by communicating to NBCU's counsel in California (1) "a demand that NBCU pay a substantial sum for JKMG to assign its registration for DUNDER MIFFLIN to NBCU," (2) a threat that Defendants "would seek to have all of NBCU's and its licensees' listings for merchandise bearing the [DUNDER MIFFLIN marks] taken down from all Internet distribution platforms, including Amazon," (3) a threat to sue NBCU for

trademark infringement, and (4) a demand that NBCU enter into a consent agreement with Defendants. *Id*.[3]

On July 1, 2022, Plaintiffs simultaneously filed a petition with the PTO to cancel JKMG's DUNDER MIFFLIN registration and this action alleging seeking to cancel the mark and hold Defendants liable for infringement. Dkt. No. 1; Dkt. No. 23 ¶ 92. At NBCU's request, the PTO suspended its proceedings pending resolution of this case. Dkt. No. 23 ¶ 92. Plaintiffs' FAC alleges federal claims for (1) trademark infringement, (2) false designation of origin and unfair competition, (3) trademark dilution, (4) cancellation of registration under 15 U.S.C. § 1052(d), and (5) cancellation of registration based on fraud, along with state-law claims for (6) common law trademark infringement, (7) common law unfair competition, (8) statutory unfair competition, and (9) statutory trademark dilution. Dkt. No. 23 ¶¶ 93–177.[4]

Defendants move to dismiss the action, arguing that (1) Defendants are not subject to personal jurisdiction in California, (2) Plaintiffs' claims are barred by laches, (3) Plaintiffs have not stated plausible claims for trademark infringement, and (4) Defendants Gooder and Talbert are improperly named as Defendants. Dkt. No. 34.

---

[3] Defendants dispute this characterization of their communications, denying that they made threats or demands, and argue that Plaintiffs violated Federal Rule of Evidence 408 by discussing the contents of JKMG's settlement negotiations. *See* Dkt. No. 34 at 26–27. Rule 408 prohibits the use of certain settlement communications "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction" but permits such communications to be admitted for other purposes. Because Plaintiffs do not seek to use JKMG's statements as evidence of liability or for impeachment purposes, their allegations do not violate Rule 408. *See Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148, 1155 (C.D. Cal. 2010) (holding that evidence of settlement communications could be properly considered in support of extortion claim because they "are not being introduced . . . to prove that the [defendants] are liable for the same claims that were the subject of the settlement communications.").

[4] The dilution claims in Counts 3 and 9 are alleged by Universal Television against all Defendants. The remaining claims are alleged by all Plaintiffs against all Defendants. In their briefing, the parties do not distinguish among the Plaintiffs, and the Court assumes for purposes of this motion that any distinctions are immaterial.

II.

Federal courts generally may not reach the merits of a case without first determining that they have personal jurisdiction over the parties. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). Thus, the Court begins with Defendants' jurisdictional challenge.

A.

Under Federal Rule of Civil Procedure 12(b)(2), defendants may move to dismiss for lack of personal jurisdiction. A plaintiff opposing such a motion bears the burden of establishing that jurisdiction is proper. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id.* (cleaned up). A plaintiff cannot simply rest on the bare allegations of its complaint, but uncontroverted allegations in the complaint must be taken as true, and conflicts in the parties' evidence must be resolved in the plaintiff's favor. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

"Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Id.* at 800–01. "For the exercise of personal jurisdiction over a defendant, due process requires that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Ranza*, 793 F.3d at 1068 (cleaned up) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). A defendant may be subject to either general or specific personal jurisdiction, depending on the nature of its contacts with the forum state. *Daimler AG v. Bauman*, 571 U.S. 117, 127–28 (2014). Here, Plaintiffs contend only that Defendants are subject to specific jurisdiction, which exists when a suit arises out of or relates to a defendant's contacts with the forum state.

Three requirements must be met for a court to exercise specific jurisdiction over a nonresident defendant:

(1)     the defendant must either "purposefully direct his activities" toward the forum or "purposefully avail[] himself of the privileges of conducting activities in the forum";

> (2)    "the claim must be one which arises out of or relates to the
>         defendant's forum-related activities"; and
>
> (3)    "the exercise of jurisdiction must comport with fair play and
>         substantial justice, i.e.[,] it must be reasonable."

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quoting *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law."  *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020).  The plaintiff has the burden of establishing the first two prongs of this test, and if it does so, the burden shifts to the defendant to provide a "compelling case" that the exercise of jurisdiction would not be reasonable.  *Schwarzenegger*, 374 F.3d at 802.

The first prong of the specific personal jurisdiction test contains two distinct concepts:  purposeful availment and purposeful direction.  *Id.*  In cases alleging trademark infringement and other tortious conduct, such as this one, the Court applies the purposeful direction test.  *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021).  That test, often referred to as the *Calder* effects test, requires the plaintiff to show that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Id*. (quoting *Axiom Foods*, 874 F.3d at 1069).

### B.

Plaintiffs allege that Defendant Talbert "manages, supervises, directly participates in, and is the moving force behind all of Gooder and JKM's operations" involving registration of marks and merchandising and that he "is the key decision maker of Gooder and JKM and has managed, supervised, and directly participated in the specific infringing conduct" alleged in the FAC.  Dkt. No. 23 ¶ 20.  Defendants have not disputed or produced evidence contrary to this allegation.  The parties generally do not distinguish among Defendants for purposes of their personal jurisdiction arguments in their briefing.  Plaintiffs argue in their supplemental brief that even though Gooder may have been the only Defendant to directly ship infringing products to California, the evidence confirms that all three Defendants operate as alter egos.  *See, e.g.*, *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003) (explaining that a subsidiary's contacts may be imputed to its parent for purposes of personal

8

jurisdiction where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent).  Defendants did not argue otherwise in their briefing, although defense counsel argued at the hearing that the parties should not be deemed to operate as alter egos because they operate out of adjacent offices, have different employer identification numbers, and had different owners when they were formed.

The evidence before the Court supports a finding that Defendants operate as a single enterprise.  Talbert testified that he is the only member and a manager of JKMG and Gooder, Dkt. No. 59-2 at 17:25–18:6, 27:24–28:3; Dkt. No. 59-3 at 16:10–22, and the companies appear to function largely as one entity.  For example, in 2017, Gooder assigned its intellectual property to JKMG for $0 in a document Talbert signed for both entities. Dkt. No. 59-26.  Gooder also sold merchandise bearing the DUNDER MIFFLIN mark for years after assigning its trademark to JKMG and before it had received a license from JKMG to do so. Dkt. No. 59-2 at 31:21–34:20.  On this record, and in the absence of any contrary argument in Defendants' motion, it appears that the Defendants operated as a single entity controlled by Talbert such that the jurisdictional analysis is the same for all Defendants.

Plaintiffs identify six separate types of conduct that they contend subject Defendants to personal jurisdiction in California:  (1) selling infringing merchandise in California, (2) operating an interactive website that facilitates sales in California, (3) interfering with Plaintiffs' contracts with licensees, including at least one in California, (4) demanding payment and rights from Plaintiffs in California, (5) threatening to sue Plaintiffs for trademark infringement, and (6) targeting Plaintiffs and injuring Plaintiffs' intellectual property rights in California. Dkt. No. 44 at 7–8.  All of these are intentional acts that—taking Plaintiffs' allegations as true—caused harm that Defendants knew would likely be suffered in California, satisfying the first and third requirements of the *Calder* effects test.  The parties' dispute centers on whether any of these acts were expressly aimed at California.

Plaintiffs allege that Defendants sold infringing merchandise to consumers in California through both their own websites and those of third parties. Dkt. No. 23 ¶¶ 8, 78, 85.  Plaintiffs also produce undisputed evidence that their agent ordered and received in California merchandise bearing the DILLON FOOTBALL mark from Defendants' Amazon.com store and merchandise bearing the DUNDER MIFFLIN mark sold by "Gooder Deals" on Walmart.com. Dkt. No. 40-1.  The former was shipped to California from "Front Desk, Gooder Deals, 1348 Milligan

Highway, Johnson City, TN 37601"—Defendant Gooder's principal place of business—while the latter was shipped from "Front Desk, Order Fulfillment Service" at the same address.  Dkt. No. 23 ¶ 17; Dkt. Nos. 40-2, 40-5.  The parties' supplemental discovery proves that Plaintiffs' order was not an aberration.  Since October 2020, Gooder has received at least 14 other orders for products bearing the DUNDLER MIFFLIN mark to be shipped to purchasers in California and has filled 13 of those orders in addition to the one placed by Plaintiffs' agent.  Dkt. No. 59-5 at 7 of 26.  Gooder's staff fills orders for products bearing the trademarks in this case at its warehouse in Tennessee, packing and shipping the products directly to California.  *Id.* at 9 of 26; Dkt. No. 59-10 at 6–7 of 10.  Of 615 sales of DUNDER MIFFLIN-branded items from October 2020 through December 2022, the lion's share—521—were sold in Tennessee, where Gooder is located.  Dkt. No. 59-22.  California was the state with the next largest share of sales, with 15, or 2.4% of the total sales.  *Id.*  Thus, Plaintiffs have made a prima facie showing that Defendants knowingly and directly mail to California products containing the marks at issue in this case.

As Plaintiffs correctly point out, numerous courts in the Ninth Circuit have found the intentional mailing of infringing products into a forum state sufficient to subject the sender to personal jurisdiction.[5]  *See Advantek Mktg., Inc. v. Shanghai Walk-Long Tools Co.*, No. CV 19-5326, 2019 WL 8811865, at *4 (C.D. Cal. Dec. 16, 2019) (evidence that defendants used Amazon.com to sell infringing products in California and "directly shipped the allegedly infringing product to California" was sufficient to establish personal jurisdiction); *FormFactor, Inc. v. Mr. Prober Tech. Inc.*, No. 13-CV-03688, 2015 WL 1870236, at *1 (N.D. Cal. Apr. 23, 2015) (finding personal jurisdiction where defendants shipped allegedly infringing products to customers in California); *Facebook, Inc. v. Kokhtenko*, No. 21-CV-

---

[5] In 2014, the Supreme Court held in *Walden v. Fiore* that the Ninth Circuit's approach to the effects test "impermissibly allow[ed] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."  571 U.S. 277, 289 (2014).  The Ninth Circuit later clarified that *Walden* had overturned its precedent holding that a willful copyright infringer could be subject to personal jurisdiction based only on its knowledge of the existence of the copyright and the forum of the copyright holder.  *Axiom Foods*, 874 F.3d at 1069–70.  Plaintiffs support some of their arguments by relying in part on cases that are no longer good law after *Walden*.  *Walden* did not discuss shipment of infringing goods, but to the extent its reasoning may have altered the relevant law, most of the decisions cited here were issued after *Walden*.

03036, 2021 WL 7448619, at *3 (N.D. Cal. Dec. 3, 2021) ("Shipping the Gucci-branded products to California is sufficient to establish personal jurisdiction."); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 782 F. Supp. 2d 868, 884 (N.D. Cal. 2011) (Koh, J.) (denying motion to dismiss for lack of personal jurisdiction where defendant "purposefully directed its activities at residents of the forum by selling allegedly infringing goods into California").

The fact that California is not Defendants' largest market does not defeat jurisdiction. In *Ayla*, the Ninth Circuit pointed out that "there is no 'small percentage of sales' exception" to the principle that substantial sales of an infringing product into the forum constitute purposeful direction because a defendant's "sales to the forum are no less substantial simply because the company sold more products elsewhere." 11 F.4th at 981. Although the forum-related sales were 10% of total sales in *Ayla*, the court grounded its discussion of "substantial sales" in the Supreme Court's decision in *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770 (1984), in which a defendant's "substantial number" of sales of its magazines in New Hampshire subjected it to personal jurisdiction, even though the magazines targeted a nationwide audience and the New Hampshire sales amounted to less than 1% of the defendant's circulation. *Ayla*, 11 F.4th at 981. In this case, the 15 sales to California, representing 2.4% of Defendants' sales of infringing products, resulted in at least 14 shipments of infringing products into California by Defendants and constitute substantial sales that support a finding of purposeful direction.

In their reply brief, Defendants dismiss the argument that their sales and shipments into California constitute express aiming, contending that "[t]he concept of 'express aiming' falls under the stream of commerce theory" and the mere act of placing a product into the stream of commerce is not enough to establish personal jurisdiction. Dkt. No. 45 at 9. But Plaintiffs do not merely allege that Defendants placed their goods into the stream of commerce and the goods ultimately ended up in California. To the contrary, Plaintiffs have made a prima facie showing that Defendants directly mailed the infringing products to California. The Ninth Circuit's rejection of the defendant's stream of commerce argument in *Ayla* is apt:

> Alya Skin has done more than merely place its products into the stream of commerce, running the risk that its products might randomly or serendipitously arrive in the United States. Alya Skin offers its products directly for sale to the United States on its website. Though some of its sales to the United States may have occurred through third-party websites, like Instagram and Facebook, Alya Skin

operates those social media accounts.  Further, Alya Skin is not a parts
manufacturer with no control over the ultimate distribution of its
products.  To the contrary, Alya Skin determines how and whether its
orders are fulfilled.

11 F.4th at 981–82 (citations omitted); *see also Philips Oral Healthcare, LLC v.
Shenzhen Sincere Mold Tech. Co.*, No. 2:18-CV-01032-TSZ, 2019 WL 1572675,
at *4 (W.D. Wash. Apr. 11, 2019) (finding personal jurisdiction where defendants
"did not passively place infringing products into the 'stream of commerce,' but
rather expressly aimed them toward Washington by sending them to Washington
addresses.").  In *Deckers Outdoor Corp. v. Reed Sportswear Mfg. Co.*, the plaintiff
alleged that the defendant "purposefully engaged in selling the Infringing Product
via Amazon.com, and purposefully and knowingly shipped the Infringing Product
to California."  No. 2:15-CV-00749, 2015 WL 5167466, at *2 (C.D. Cal. Sept. 3,
2015).  The court denied the defendant's motion to dismiss for lack of personal
jurisdiction, explaining that the stream of commerce theory was inapposite because
it applied in "cases involv[ing] distribution of the products through third parties."
*Id*.  Since the defendant in *Deckers* was shipping the infringing product to
California itself, the court concluded that there was "no need for the Court to look
for further contacts with California."  *Id*.[6]

        Defendants have not identified any authority holding that the direct mailing
of infringing products into the forum state does not constitute express aiming at the
forum state.  On this record, Plaintiffs have satisfied the *Calder* effects test.
Moreover, while the Court need not determine whether the other acts of
Defendants identified by Plaintiffs—including operating an interactive website to
allow California customers to buy infringing products, issuing takedown notices to
eBay (a California business), some of which targeted California companies selling
products licensed by Plaintiffs, making demands to Plaintiffs in California, and
sourcing its apparel in part from a California supplier[7]—are independently
sufficient to justify the assertion of personal jurisdiction, those acts provide at least

---

[6] *Deckers* was a patent case that applied Federal Circuit precedent, but the Court
finds its reasoning persuasive and is unaware of any authority suggesting that the
Ninth Circuit applies the stream of commerce theory differently.

[7] Although the supply-source contact was not raised in the pleadings or addressed
in the original briefing on Defendants' motion, Plaintiffs learned through
jurisdictional discovery that Defendants in 2022 ordered more than a thousand
items of blank apparel such as hoodies and blazers from a California vendor.  Dkt.
Nos. 56-1, 56-2.

some additional support for the Court's finding that Defendants targeted California.[8]

Having made a prima facie showing that Defendants purposefully directed their activities at California, Plaintiffs have also satisfied the second prong for assertion of personal jurisdiction (on which Defendants do not focus):  Plaintiffs' claims for trademark infringement, dilution, and unfair competition arise out of or relate to Defendants' forum-related activities.  The burden therefore shifts to Defendants to make a "compelling case" that the exercise of jurisdiction would not be reasonable.  *Schwarzenegger*, 374 F.3d at 802.  Defendants conclusorily assert that "[e]xercising personal jurisdiction over the defendant[s] would not comport with fair play and substantial justice," Dkt. No. 34 at 24, but they make no showing of why this is so.  On this record, it appears to be fair to subject Defendants to jurisdiction in California based on their direct shipment of allegedly infringing merchandise to the state.  Defendants' motion to dismiss for lack of personal jurisdiction is therefore denied.

III.

Defendants also raise two challenges to the merits of Plaintiffs' claims, arguing that Plaintiffs have failed to state a claim for trademark infringement and that Plaintiffs' claims are barred by laches.

A.

In support of their motion, Defendants request that the Court take judicial notice of nearly 20 exhibits, including documents related to Defendants' trademark registrations, screenshots of Plaintiffs' website, and search results for barcodes contained in the images in Plaintiffs' FAC.  Dkt. No. 35.  Plaintiffs oppose Defendants' request for judicial notice (RJN) and seek judicial notice of a

---

[8] Defendants focus on whether their online activity alone is sufficient to subject them to personal jurisdiction, relying heavily on *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020).  The website at issue in *AMA*, which the court found did not target the United States, offered free pornography and generated revenue solely through advertising.  Thus, the defendant did not send any products into the forum.  As explained above, the Court's finding of personal jurisdiction depends primarily on Defendants' direct mailing of allegedly infringing products into California, not on the mere fact that its websites were accessed by California residents.

screenshot from Defendants' website.  Dkt. Nos. 41, 47.  Neither side adequately identifies in its request which facts in the proffered exhibits are properly subject to judicial notice.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (noting that while a court may generally take judicial notice of public records, it "cannot take judicial notice of disputed facts contained in such public records" and must "consider—and identify—which fact or facts it is noticing" from a document that is susceptible to judicial notice).  Plaintiffs also raise serious arguments that many of the exhibits to Defendants' RJN are improper for the Court's consideration on Defendants' Rule 12(b)(6) motion.  In any event, none of the exhibits in the parties' RJNs, even if proper, would alter the Court's conclusions below.  Accordingly, the RJNs are DENIED as moot.

### B.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In resolving a Rule 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.  That is, a pleading must set forth allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555).  Assuming the veracity of well-pleaded factual allegations, a court next must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.  There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

### C.

To show federal trademark infringement, a plaintiff must demonstrate that (1) it owns a valid mark (whether registered or unregistered), and thus a protectable interest, and (2) the defendant's use of the mark is likely to cause confusion, mistake, or deception. *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009).  "As a general matter, trademark claims under California law are 'substantially congruent' with federal claims and thus lend themselves to the same analysis." *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1100 (9th Cir.

2004).  Defendants' challenge to the adequacy of Plaintiffs' trademark infringement claims[9] boils down to their repeated assertion that Plaintiffs do not own common law trademarks in DUNDER MIFFLIN or the FNL Marks because (1) the marks' appearance in the television shows was insufficient to create trademark ownership and (2) Plaintiffs did not use the marks in commerce as source identifiers.[10]  Both arguments fail.

Defendants rely heavily on the Fifth Circuit's decision in *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, a leading case on common law trademark rights in elements of television shows.  891 F.3d 178 (5th Cir. 2018).  In *Viacom*, the producer of the animated television show *SpongeBob SquarePants* brought trademark infringement claims based on the defendant's operation of seafood restaurants named The Krusty Krab—the same name as the fictional restaurant where the show's main character works.  The Fifth Circuit affirmed summary judgment in favor of the plaintiff, determining that specific elements from a television show may receive trademark protection and that "[t]he salient question is whether The Krusty Krab mark, as used, will be recognized *in itself* as an indication of origin for the particular product or service."  *Id.* at 186–87.  Surveying the relevant cases from other circuits, the court concluded that trademark protection is "ordinarily granted" when an element plays a "central role" in a franchise and that The Krusty Krab was a protected mark because it "is integral to 'SpongeBob SquarePants,' as it appears in over 80% of episodes, plays a prominent role in the SpongeBob films and musical, and is featured online, in video games, and on licensed merchandise."  *Id.* at 187–88.

The holding in *Viacom* does not support dismissal here.[11]  On the contrary, Plaintiffs have plausibly alleged that DUNDER MIFFLIN is similarly prominent in

---

[9] It is unclear from Defendants' motion whether they intend to challenge the adequacy of only Plaintiffs' infringement claims in Counts 1 and 6 or also some or all of Plaintiffs' other claims.  Because their arguments for dismissal fail, the distinction is immaterial.

[10] Defendants also ask the Court to strike phrases such as "scheme to extract money" from Plaintiffs' briefing, arguing that "[t]his phraseology is unduly prejudicial."  Dkt. No. 45 at 11.  Plaintiffs' language accurately describes their theory of the case and is not improper.  Defendants' request to strike is DENIED.

[11] Defendants cite and discuss *Viacom* extensively, while Plaintiffs address the decision only briefly in a single paragraph.  Yet Defendants inexplicably argue in

*The Office*.  Dunder Mifflin is the name of the company at which the show's characters work, and the DUNDER MIFFLIN mark appears in all 201 episodes of the show.  The FAC includes five and a half pages of stills from 29 episodes showing the use of the mark.  Dkt. No. 23 ¶ 28.  Defendants contend that these stills are inadequate to show that the mark was regularly featured in the show because Plaintiffs did not include stills from every episode of the show and some of the stills do not show the entire mark.  This argument borders on frivolous.  Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  It does not require hundreds of examples to support a plausible assertion.  In the absence of a reason to doubt its plausibility, Plaintiffs' allegation that the mark is featured in every episode is taken as true, and the inclusion of examples from 29 episodes more than satisfies Plaintiffs' burden.  At this pleading stage, Plaintiffs have adequately alleged that DUNDER MIFFLIN plays a central role in *The Office* and is entitled to common law trademark protection.  *Viacom*, 891 F.3d at 187.[12]

The parties focus on the DUNDER MIFFLIN mark, and Defendants raise only general challenges to the FNL Marks without identifying any specific deficiencies in Plaintiffs' pleading.  The FAC alleges that "*Friday Night Lights* heavily featured the Dillon High School football team, the Panthers, and the East Dillon football team, the Lions, in numerous episodes" and "featured several marks including [the FNL Marks] and stylized logos for each mark . . . in the show's episodes."  *Id*. ¶ 50.  At the pleading stage, Plaintiffs have plausibly alleged that the FNL Marks are protected because they play a central role in *Friday Night Lights*.

The FAC also adequately alleges that Plaintiffs have used DUNDER MIFFLIN and the FNL Marks in commerce as source identifiers.  Plaintiffs allege in detail their continued and widespread use of the marks on apparel and other merchandise sold to the public since at least November 2006 (for DUNDER MIFFLIN) and February 2011 (for the FNL Marks)—before Defendants' first claimed use of their respective marks.  Defendants extensively argue that the marks

their reply that "[t]he [*Viacom*] case cited by Plaintiffs is not binding authority in the present matter, and is . . . not instructive . . . ."  Dkt. No. 45 at 15.

[12] Defendants' additional argument that Plaintiffs do not own DUNDER MIFFLIN because it originated in the U.K. television show misreads the FAC, which clearly alleges that "[w]hile *The Office* was adapted from a television series in the U.K., the fictional Dunder Mifflin Paper Company does not appear in the U.K. version."  Dkt. No. 23 ¶ 26.

function only as ornamentation and not as source identifiers, relying on examples in the FAC of sales tags on the apparel sold by Plaintiffs that show "THE SHOP AT NBC STUDIOS" over a barcode, with "THE OFFICE DUNDER MIFFL" and "DUNDER MIFFILN TOTE" under the barcode. *Id*. ¶ 31.  Defendants argue that only "THE SHOP AT NBC STUDIOS" serves as a source identifier, and the other text merely identifies the products.  But this argument ignores that the items themselves—not just the sales tags—prominently display the DUNDER MIFFLIN mark.  It is not implausible that consumers viewing apparel and other merchandise emblazoned with distinctive marks taken directly from popular television shows would assume that the goods are produced by the creators of the television shows or their licensees, regardless of the contents of the tags on the items.  *See Viacom*, 891 F.3d at 188–89 ("Both the Federal Circuit and the T.T.A.B. have held that a word mark does not lose its strength as a trademark when the manufacturer's mark is identified along with the branded product. . . . The Krusty Krab creates a distinct commercial impression signifying to consumers that products like Krusty Krab playsets or aquarium ornaments originate from the famous fictional restaurant that employs their beloved sea sponge character." (cleaned up)).

The court in *Viacom* affirmed summary judgment for the plaintiff because "The Krusty Krab's key role in 'SpongeBob SquarePants' coupled with the consistent use of the mark on licensed products establishes ownership of the mark because of its immediate recognition as an identifier of the source for goods and services." *Id*. at 189.  Plaintiffs' similar allegations here are adequate to survive a pleading challenge under Rule 12(b)(6).  Defendants have not shown that Plaintiffs' trademark claims should be dismissed because they fail to plausibly allege ownership of valid marks.  And although the parties do not focus on the second element of the trademark claims, Defendants' alleged marketing of goods with marks that are nearly identical to Plaintiffs' distinctive marks supports a plausible claim that consumers are likely to be confused.

### D.

Defendants next argue that Plaintiffs' claims are barred by laches.  "Laches is an equitable time limitation on a party's right to bring suit" that requires the defendant to show both unreasonable delay by the plaintiff and prejudice to the defendant.  *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000).  In *Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*, on which Defendants rely, the Ninth Circuit held that the equitable doctrine of laches was available as a defense to trademark claims.  894 F.3d 1015 (9th Cir. 2018).  *Pinkette*, however, affirmed a district court's post-trial determination that laches barred the plaintiff's claims.

The Ninth Circuit has repeatedly cautioned that because laches "depends on a close evaluation of all the particular facts in a case" it is "seldom susceptible of resolution by summary judgment." *Kling*, 225 F.3d at 1041 (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)).  "At the motion-to-dismiss phase, the obstacle to asserting a successful laches defense is even greater because the defendant must rely exclusively upon the factual allegations set forth in the complaint." *Kourtis v. Cameron*, 419 F.3d 989, 1000 (9th Cir. 2005) (finding laches challenge "premature"), *abrogated on other grounds by Taylor v. Sturgell*, 553 U.S. 880 (2008).

Defendants cite no authorities granting dismissal based on laches on a Rule 12(b)(6) motion, much less on allegations like those here.  Moreover, it is not apparent from the face of the FAC that Plaintiffs unreasonably delayed filing suit or that Defendants were prejudiced by any such delay.[13]  *See McCarthy v. Johannesson*, No. CV 12-02099, 2012 WL 12887540, at *4 (C.D. Cal. Dec. 11, 2012) (denying motion to dismiss based on laches where "the facts alleged in the complaint provide no information as to whether the delay was reasonable or unreasonable," nor "sufficient information to conclude that defendants have been prejudiced by plaintiffs' delay").  Defendants are not entitled to dismissal based on laches.

IV.

Finally, Defendants raise a brief argument that JKMG is the only correct Defendant and that Gooder and Talbert should be dropped as improperly joined. Defendants rely on statements in Talbert's declaration that (1) he acted as an agent of JKMG, (2) Gooder has no ownership interest in the trademarks at issue, and (3) JKMG indemnified Gooder against these types of actions.  *See* Dkt. No. 34-1. Defendants rely exclusively on Rule 21, which provides for dismissal of misjoined parties.  However, they do not argue that Gooder and Talbert were improperly joined under Rule 20 or that their dismissal is necessary to preserve federal jurisdiction, nor do they otherwise explain the applicability of Rule 21.

---

[13] Defendants argue that they were prejudiced because Plaintiffs filed their petition for cancellation only three days before Defendant JKM would have attained incontestability for its DUNDER MIFFLIN mark.  But if Plaintiffs had filed the petition earlier, it still would have precluded the mark from becoming incontestable.  Thus, the only harm identified by Defendants is unrelated to any delay by Plaintiffs.

18

Even if their motion were procedurally proper, Defendants have not shown that Gooder and Talbert are improper parties to this action.  Gooder filed the application to register the DUNDER MIFFLIN mark, which Talbert signed.  Dkt. No. 23 ¶ 68.  Plaintiffs' evidence suggests that Gooder continues to sell and distribute products bearing the disputed marks.  Dkt. No. 40-1.  An indemnity agreement between JKMG and Gooder may affect how those entities divide payment of any judgment entered against them, but it does not immunize Gooder from Plaintiffs' claims.  And Talbert is the owner, president, and CEO of both Gooder and JKMG and is alleged to have knowingly directed their relevant infringing acts in this case.  Dkt. No. 23 ¶ 11.  In general, a corporate officer is "personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985).  Defendants' request to dismiss Gooder and Talbert as improperly joined is denied.

V.

Plaintiffs have plausibly alleged that Defendants infringed their common law trademarks, and Defendants' various arguments for dismissal are meritless.  Defendants' motion to dismiss is therefore DENIED.

Date: January 27, 2023

_____
Stanley Blumenfeld, Jr.
United States District Judge